ARTHUR H. SODEN *vs.* JOHN CLANEY *et al.*—(THE CITI-
ZENS BANK OF MUKWONAGO, Plaintiff in Error, *vs.*
ARTHUR H. SODEN *et al.* Defendants in Error.)

*Opinion filed June 24, 1915—Rehearing denied October 8, 1915.*

1. PRACTICE—*denial of writ of certiorari is not an approval of
Appellate Court's reasons for its judgment.* While the denial of
a petition for a writ of *certiorari* by the Supreme Court makes ·
the judgment of the Appellate Court final in the cases specified
in section 121 of the Practice act, yet the effect of such denial
is merely an approval of the conclusion reached by the Appellate
Court, being, in effect, an affirmance of the judgment, and is not
necessarily an approval of the reasons given in the opinion of the
Appellate Court for its judgment.

2. SAME—*effect where two defendants file separate petitions
for certiorari and only one is allowed—cross-error.* Where the
two defendants to a bill prosecute separate appeals from the de-
cree to the Appellate Court, and thereafter, upon the appeals be-
ing consolidated and the decree affirmed, file separate petitions for ·
*certiorari* in the Supreme Court, where one petition is allowed
and one denied, the party whose petition is denied is concluded
by such action, and he cannot have the same matters reviewed
again by the Supreme Court by assigning cross-errors on the rec-
ord upon which the other *certiorari* petition was allowed.

3. ESTOPPEL—*when owner of equitable title is not estopped to
deny claim of bank.* The mere fact that the equitable owner of
land purposely conceals his ownership for reasons of his own and
permits the legal title to remain in another does not raise an es-
toppel which will preclude his right to deny the claim of a bank to
a lien on the premises for money loaned to a third person, where
the bank was in no way misled or deceived by his action but
loaned the money and extended the credit upon the personal rep-
resentations of the borrower and without reference to the owner-
ship of the premises.

WRIT OF ERROR to the Branch "B" Appellate Court for
the First District—heard in that court on appeal from the
Circuit Court of Cook county; the Hon. KICKHAM SCAN-
LAN, Judge, presiding.

ELA, GROVER & MARCH, (FRANK R. GROVER, of counsel,) for plaintiff in error.

HELMER, MOULTON, WHITMAN & WHITMAN, and HOYNE, O'CONNOR & IRWIN, (FRANK A. HELMER, and LLOYD C. WHITMAN, of counsel,) for defendants in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

Arthur H. Soden, claiming to be the owner of the leasehold, and a large apartment building situated thereon, at the northwest corner of Indiana avenue and Twenty-fourth street, in the city of Chicago, on August 1, 1907, filed his bill in the circuit court of Cook county praying that John Claney, the holder of the legal title to the premises, be decreed to convey to Soden such title, and for an accounting for rents and profits. Willis P. Dickinson and the Citizens Bank of Mukwonago, Wisconsin, were also made parties defendant. These defendants answered severally, and the bank filed a cross-bill, wherein it alleged that on July 31, 1903, Claney purchased the premises in question at foreclosure sale and received a master's certificate of sale therefor; that Claney became such purchaser at the solicitation of Dickinson, who was then acting as agent for Soden; that on November 1, 1904, Claney secured a master's deed to the premises and thenceforth was the record holder of the title; that through misrepresentations made to the bank that Dickinson was the equitable owner of an interest in the property and that he and Claney owned it jointly, Dickinson procured a loan from the bank and gave as security therefor his alleged interest in these premises, and that Soden, by his conduct in holding out Claney as the owner of the premises and in allowing Dickinson and Claney for a long time to exercise acts of ownership and to obtain credit of the bank, subordinated his rights and interests to the rights, interests and equitable

lien of the bank, to the end that the lien of the bank should be maintained and protected, and that Soden is in equity estopped from denying the interest of the bank. The cross-bill prayed that the lien of the bank be established, and that the defendants, or some of them, be decreed to pay the amount due, and that in default the premises be sold to satisfy the decree, or, in the alternative, that a lien be established in favor of the bank upon the interest of Dickinson in the premises.

By his answer Dickinson claimed to have had some interest in the premises but alleged that the same had been assigned to Claney. Claney answered, denying the material allegations of the bill, and alleging that he purchased the property at foreclosure sale pursuant to a contract entered into between Soden, W. P. Dickinson and John W. Dickinson, which provided for the purchase of this property and of the adjustment thereafter of the interests of the parties to the contract in the same; that by assignments duly made he succeeded to the rights of Willis P. Dickinson and John W. Dickinson in that contract, and that he held the title to the property pursuant to the terms of that contract, and has never failed to recognize the ultimate right of Soden to be protected by the property to the extent of his interest therein according to the provisions of the contract referred to.

Issues having been formed on the bill and cross-bill, the cause was referred to a master in chancery of the circuit court to take the proof and report the same, together with his findings thereon. The master reported that Soden was entitled to the relief prayed for in the original bill and that the Citizens Bank of Mukwonago had an equitable lien on the premises for the sum of $11,929.09, with interest at the rate of five per cent from the 19th day of July, 1907. Exceptions to the master's report relative to his findings on the original bill were overruled. Exceptions to the report of the master relative to his findings as to the lien

of the bank were sustained, and a decree was entered according to the prayer of the original bill and dismissing the cross-bill of the bank. From this decree separate appeals were prosecuted by Claney and the bank to the Appellate Court for the First District. These causes were consolidated in the Appellate Court and the decree of the circuit court was affirmed. At the October term, 1914, of this court, Claney and the Citizens Bank of Mukwonago filed separate petitions for the statutory writ of *certiorari* to review the judgment of the Appellate Court. These petitions were considered upon their merits, and the petition of Claney was denied but the petition of the bank was allowed and the writ of *certiorari* ordered to issue. Claney thereafter asked for and was allowed leave to assign cross-errors, which challenged the correctness of the judgment of the Appellate Court so far as it affirmed the decree of the circuit court in granting the relief prayed for in the original bill.

Upon the issuance of the writ of *certiorari* on the petition of the bank this cause proceeded under our rules as if pending on writ of error, and under section 107 of the Practice act, Claney, as a defendant in error, had the right to assign cross-errors on the record. This right extended, however, only to such questions as were at issue and undetermined in the cause. By section 121 of the Practice act the judgments or decrees of the Appellate Court are made final in all cases except those wherein appeals and writs of error are specifically required by the constitution to be allowed from the Appellate Courts to the Supreme Court, or in cases where certificates of importance are allowed by the Appellate Court, or in cases which the Supreme Court may require to be certified to it by *certiorari* or otherwise. The denial by this court of a petition for *certiorari* in a case not required by the constitution to be reviewed by this court and where a certificate of importance has not been issued by the Appellate Court makes the

judgment of the Appellate Court in that case final. It does not follow that such a denial of a petition for the writ of *certiorari* is an approval of the reasons upon which the Appellate Court bases its judgment, but it is an approval of the conclusion reached, and is therefore, in effect, an affirmance of the judgment. Had Claney not filed his petition for *certiorari* and had he relied upon the petition filed by the bank to secure a review of the Appellate Court judgment, he could then have assigned cross-errors upon this record challenging the judgment, as it affected him as a defendant in the original bill. Having elected to pursue a different and independent course by filing his own petition for the writ of *certiorari,* and having thus submitted his case as a defendant in the original bill to this court and secured a finding thereon, he is concluded by that action and cannot now be heard on any cross-errors which present the same matters for the consideration of the court. The effect of denying Claney's petition for the writ of *certiorari* was to hold that there were no probable grounds for the reversal of the judgment of the Appellate Court so far as it affected the rights of Claney as a defendant in the original bill. The cross-errors assigned by Claney and the argument based thereon all go to that part of the judgment of the Appellate Court which affects the rights of Claney as a defendant in the original bill. These matters having been finally disposed of on Claney's petition for *certiorari,* they will not be further considered.

Some time prior to the year 1903 an apartment building, known as the Concord Apartment House, was built upon the leasehold in question by the Concord Apartment House Company, the cost of erection being paid partly from the proceeds of bonds which were secured by a trust deed upon the leasehold and the improvements. Soden was a purchaser of some of these bonds. There having been a default in the payment of interest, foreclosure proceedings were instituted in the circuit court of Cook county

which resulted in a decree for the sale of the premises. It
appears from the testimony that prior to the date of the
sale, which was fixed for July 31, 1903, Soden arranged
with Willis P. Dickinson, with whom he had transacted
some business theretofore, to purchase the property for
him in the name of his son, Charles A. R. Soden. At
the sale Dickinson purchased the property in the name of
Claney instead of Soden's son, which act on his part was
thereafter ratified by Soden. The master issued Claney
a certificate of sale, which was immediately assigned to
Charles A. R. Soden and transmitted to him on August 6,
1903. Thereafter this certificate of sale was re-assigned
to Claney, and a master's deed was issued to him on No-
vember 1, 1904. At the time of and prior to the foreclo-
sure proceedings there were various mechanics' liens and
judgments which were liens upon this property. Some of
these were superior to the trust deed being foreclosed and
others were subject to it. One of these judgments was in
favor of the Tobey Furniture Company, and the property
had been sold at sheriff's sale to satisfy this judgment.
Claney, with money furnished by Soden, procured an as-
signment of the sheriff's certificate of sale, and in Febru-
ary, 1904, had a sheriff's deed issued to him pursuant to
this certificate. This deed was not placed upon record.

Willis P. Dickinson was engaged in the brokerage busi-
ness in the city of Chicago, and about the year 1902 he
began selling commercial paper to the Citizens Bank of
Mukwonago. Practically all of this paper was indorsed
and guaranteed by Dickinson, who represented himself to
the bank to be a man of large means. Some of the paper
so sold to the bank was the paper of Claney, or of John
Claney & Co., of which Claney was the sole member. In
the summer of 1904 the bank held paper thus indorsed by
Dickinson, amounting to something over $11,000, which
it was unable to collect. Beginning in June of that year,
and extending through the months of July and August, the

officers of the bank had frequent conferences with Dickinson at Mukwonago in reference to his liability to the bank. On June 30 Dickinson rendered a written statement to the bank of his assets and liabilities whereby he showed his net worth to be $202,665. Among his assets he scheduled "interest in real estate northwest corner of Indiana and 24th Sts. (clear) $100,000." He stated to the bank officials that he owned a half interest in this property, which he referred to as the "Concord" or "Concordia" apartments, and that the legal or record title was in John Claney, who owned the other half interest. On September 7, 1904, Dickinson gave his note to the bank for $11,060, due in six months, with which to take up the paper the bank then held and upon which Dickinson was guarantor. As collateral to this new note Dickinson put up 950 shares of capital stock in the Pacific Tube Works, the notes which the bank had formerly held and for which this new note was given, and made a written assignment to the president of the bank of all his "right, title and interest in and to the property known and described as the Concord Apartment House Company, situated on the northwest corner of Indiana avenue and Twenty-fourth street, in the city of Chicago." This instrument described the notes and shares of stock also put up as collateral, and provided that when the said indebtedness of $11,060 was fully paid this assignment of Dickinson's interest in these premises should be canceled and surrendered to him. Prior to this time the bank had made no investigation to ascertain whether Dickinson had any interest in the Concord Apartment House property or to verify any of his statements relative to his alleged interest. At the time the $11,060 note was given and this assignment of his alleged interest in these premises was made to the bank, Dickinson referred the bank to Claney. The bank thereafter wrote a letter to Claney, who also resided in the city of Chicago, inquiring as to Dickinson's interest in this property. This letter is not in

evidence.   To this inquiry Claney replied on September 21, 1904, as follows:

CHICAGO, *Sept. 21, 1904.*

"*Perry Camp, Cashier, Mukwonago, Wis.*

"DEAR SIR—Replying to your inquiry regarding real estate in which W. P. Dickinson claims interest, I beg to say that in August, 1903, I bought the property in question at master's sale and paid something like $50,000 for the same on Mr. Dickinson's order and am still the record holder of the same.   The property is well located, and the building I think originally cost for construction, in 1896, about $300,000, and certainly could not be built for less than original cost.   Rentals are about $2500 per month, gross.   Building is in good repair, etc.; insurance $150,000.   I do not know what Mr. Dickinson's interest is, but have always understood it was large.      "Yours truly,

JOHN CLANEY."

At this time Claney held the unrecorded sheriff's deed issued pursuant to the sale under the Tobey Furniture Company's judgment and the master's certificate of sale under the foreclosure proceedings.   After receiving this communication from Claney the bank caused the records to be investigated, and learned that Claney was the purchaser at the foreclosure sale and was entitled to a deed upon the expiration of the period of redemption.

Dickinson failed to pay the $11,060 note at its maturity.   On April 19, 1905, he took up this note and delivered in its stead five notes, due in one, two, three, four and five months, respectively, and aggregating $13,508, presumably receiving the difference between the amount of this note and the amount due on the note of September 7, 1904, in cash.   These notes were not paid when due, but on March 10, 1906, they were taken up and two demand notes, aggregating $13,500, given in their stead.   On November 9, 1906, two new notes were given by Dickinson to the bank, due in four and six months, respectively, aggregating in amount $11,450, which were in lieu of the notes of March 10, 1906.   To secure the payment of the notes given April 19, March 10 and November 9, the assignment of September 7, 1904, was in each instance put up as collat-

eral. Some time during the early summer of 1905,—but whether before or after the making of the notes of April 19, 1905, does not appear,—Dickinson delivered to the bank a copy of a contract dated June 30, 1903, which is the contract alleged to have been entered into between Soden and the two Dickinsons prior to the foreclosure sale. This contract recited that whereas this property was to be sold at foreclosure sale, it should be purchased by the parties thereto and the title taken by Soden or anyone whom he should select, for the joint interests of the three parties to the contract. It was then provided that Soden should furnish the necessary money for the purchase of the property, provided that the Concord Apartment House Company should make and deliver a deed to Soden for the premises prior to the foreclosure sale; that after the purchase of the property by Soden at the sale, 400 five per cent first mortgage gold bonds, each of the par value of $500, should be issued, and from this issue of bonds Soden should receive at par a sufficient number, in amount, to pay him in full for his advancements; that John W. Dickinson should receive twenty of the bonds, and the remainder should be divided, thirty per cent to Soden and thirty-five per cent each to John W. Dickinson and Willis P. Dickinson. The interest of John W. Dickinson in this contract had been assigned to Willis P. Dickinson, and he in turn had assigned his interest to Claney. By its decree the circuit court found that Soden had never executed this instrument but that his signature attached to it was a forgery. This finding is fully warranted by the evidence, and we concur in it.

There is no dispute between the parties as to the law applicable to the case. The only question involved is whether the facts are such as to create an equitable estoppel against Soden to assert his rights as against the claim of the bank. It is undisputed that Soden concealed his interest in this property, and that he purposely and for

reasons of his own invested Claney with the legal title
and all the indicia of ownership. The record title stood
in Claney, and after November 1, 1904, Claney was in
possession and with W. P. Dickinson assumed the full
management of the property. So far as the bank or any-
one else was concerned, Soden held Claney out as the
owner of the property, and if, as a result of that, the
bank was led to rely and act upon the apparent ownership
of Claney and was thereby caused to change its position
to its harm and detriment, Soden is estopped to deny the
right of the bank to enforce its equitable lien. The bank,
however, did not extend credit to Claney upon the strength
of his apparent ownership of this property. While Claney
had some dealings with the bank through Dickinson, it
does not appear that any credit was extended him because
of his alleged interest in this property, and so far as this
record discloses, Claney has paid the bank every cent he
ever owed it. While Dickinson acted as the agent and
representative in Chicago of Soden, who was a resident of
Massachusetts, the bank had no knowledge of this fact, and
it appears that it never heard of the existence of Soden
until Dickinson delivered to it the copy of the contract
of July 30, 1903, during the summer of 1905. In taking
the commercial paper negotiated by Dickinson during the
years 1902 and 1903 the bank relied solely upon the repre-
sentations of Dickinson as to his personal financial stand-
ing and responsibility. When the officials of the bank be-
gan pressing him in June, 1903, they had become skeptical
of Dickinson's responsibility, as one of the officials of the
bank puts it, and after he had made a written statement
of his assets and liabilities they were not satisfied and in-
sisted that he must give some real estate security for his
indebtedness. The bank had reached the point in its deal-
ings with Dickinson where it was demanding either an
immediate payment of his indebtedness or ample real estate
security. During these negotiations Dickinson informed

the bank that he owned a half interest in the premises
in question clear of all incumbrance and worth $100,000.
He stated that John Claney held the record title and owned
the other half interest. An investigation would have dis-
closed that Claney at that time held a master's certificate
of sale and that there were various outstanding mechan-
ics' liens and judgments, the holder of any one of which
was entitled to redeem from the master's sale. The bank
made no investigation whatever but relied solely upon the
assurances and word of Dickinson and took an assignment
of his alleged interest as collateral to the new note for
$11,060. Two weeks thereafter it received a letter from
Claney, in reply to an inquiry made, which failed to sub-
stantiate the statement made by Dickinson. By that letter
Claney stated that he bought the property at master's sale
on Dickinson's order and was still the record holder of
the same. From this statement no other inference could
be drawn than that Claney had no actual interest in the
property but was holding the record title for some undis-
closed person. In conclusion he states that he does not
know what Dickinson's interest is, although he has always
understood it was large. Dickinson's statement to the of-
ficials of the bank was, that while the record title was in
Claney he owned an undivided one-half of the premises
and Claney owned the other half. It would seem remark-
able that any prudent business man, after receiving such a
statement, should be satisfied with the response the bank
received from Claney. If Claney was a tenant in common
with Dickinson in this property, owning the undivided one-
half, he seemed to be unaware of the fact. He states un-
equivocally that he does not know what Dickinson's interest
is. He does not assert that he himself has any further
interest in the property than as the holder of the record
title. His statement that he has always understood that
Dickinson's interest was large is not sufficient. It is not
such a statement by the holder of a legal title as will estop

the equitable owner. The only investigation ever made by the bank thereafter was to determine whether the legal title was still in Claney. Although Dickinson furnished the bank, in the summer of 1905, with a copy of the agreement of June 30, 1903, which it was claimed Soden had executed, and although this was the first time that any official of the bank had ever heard that Soden was interested in the property, no inquiry was made of him as to his interest or the interest of Dickinson. The notes of March 10, 1906, and November 9, 1906, were given to the bank after it had been furnished with the copy of this alleged agreement, and although, under the terms of this agreement, Dickinson did not have the interest in the property which he reported to the bank, the officials of the bank testified that the forbearances of March 10 and November 9, 1906, were made upon the assurances that Dickinson still owned an undivided one-half interest in this property and in consideration of the assignment of such interest as collateral security.

It does not appear from the record whether at any time during the period of his negotiations with the bank Dickinson was solvent. The only evidence bearing upon this is the fact that during the years 1902 and 1903 there were a number of unsatisfied judgments of record against him in the various courts of record of Cook county. That question, however, as we view the matter, is not important. Under the facts as disclosed it cannot be said the Citizens Bank of Mukwonago was in any way deceived or misled by the act of Soden in allowing Claney to hold the legal title to these premises. The bank, without any assurances on the part of Claney sufficient to bind him or his principal, Soden, relied upon the word of Dickinson that he owned an interest in this property. Soden is in nowise bound or estopped by any representation made by Dickinson to the bank.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*